## PHILIP GARMAN v. JOSEPH D. POTTS.

APPEAL BY PLAINTIFF FROM THE COURT OF COMMON PLEAS OF LANCASTER COUNTY.

Argued May 19, 1890—Decided June 2, 1890.
[To be reported.]

1. A mining lease provided that the lessee should mine ore "at the rate of fifteen hundred tons per annum, on an average, provided the iron ore can be advantageously mined." In such case, the lessee was not

Statement of Facts.

obliged to continue mining if the expense of doing so was greater than the value of the ore at the mine mouth.

(*a*) Said lease further provided that any excess of fifteen hundred tons of iron ore mined and carried away in any one year, and paid for, should go as a credit on the iron ore to be mined in future years, and that settlements for ore mined and carried away should be made annually.

(*b*) The lessee did not mine and carry away fifteen hundred tons of ore in any one year. For several years he paid annually to the lessor royalty upon fifteen hundred tons, taking from him receipts stipulating that the amounts paid in excess of the royalty on ore mined and carried away should be credited in future settlements:

2. In an action on the lease for royalty upon ore subsequently carried away, these receipts were admissible to show that the lessee was entitled to credits against the royalty claimed, and it was not competent for the lessor to testify that they were explained to him "as simple receipts," without any intimation "that they changed the lease."

Before PAXSON, C. J., STERRETT, GREEN, CLARK and McCOLLUM, JJ.

No. 29 July Term 1889, Sup. Ct.; court below, No. 31 May Term 1888, C. P.

On April 20, 1888, Philip Garman brought assumpsit against Joseph D. Potts, to recover certain moneys alleged to be due from the defendant to the plaintiff upon a lease of a certain iron mine. The lease declared on was dated September 25, 1872, and was between the plaintiff, as party of the first part and lessor, and Levi B. Smith & Co., as lessees and parties of the second part. It contained the following stipulations:

" The party of the second part, for themselves, their heirs and assigns, agree to pay to the said party of the first part, his heirs or assigns, forty cents per gross ton, on all iron ore by them mined and carried away from the said premises. The parties of the second part also agree to mine the iron ore at the rate of fifteen hundred tons per annum, on an average, provided the iron ore can be advantageously mined, and as much more as they may see fit to mine; and any excess of fifteen hundred tons of iron ore, mined and carried away from the said premises in any one year and paid for, shall go as a credit on the iron ore to be mined in future years. All settlements for iron ore mined and carried away from the within mentioned premises shall be made annually, and paid for in

Statement of Facts.

full on or before the first day of April, each and every year. And further, the said parties of the second part agree to pay all road taxes assessed on the said mines."

The plaintiff's statement of claim averred that by assignment dated March 20, 1880, said lease was sold and transferred by the lessees to the defendant, who took possession; that said iron ore could have been advantageously mined ever since the date of said lease, and that a minimum rental of $600 per annum had fallen due thereon on the first day of April in each year; that no payments had been made after April 1, 1883, and the rentals falling due in each year thereafter, to and including 1888, remained due from the defendant to the plaintiff, with interest; and that the defendant was also indebted to the plaintiff in the sum of $9.23, for road taxes upon the mine, which the plaintiff had been compelled to pay through the neglect and refusal of the defendant to do so. The defendant pleaded non-assumpsit.

At the trial on February 20, 1889, the following facts were shown, upon the part of the plaintiff.

Levi B. Smith & Co. went into possession under the lease mentioned in the statement of claim, and that firm and its successor, the firm of Smith Brothers, worked the mine from 1872 until 1880, making each year a payment of $600 to the lessor as royalty. During the period named ore was mined and carried away as follows:

| | | | | | Tons. | Cwt. |
|---|---|---|---|---|---|---|
| Up to April 1, 1874, | . | . | . | . | 320 | 04 |
| Year ending April 1, 1875. . | | . | . | { | 5 | 06 |
| | | | | { | 99 | 13 |
| "    " | 1876. | . | . | . | 101 | 17 |
| "    " | 1877. . | . | . | | 252 . | 17 |
| "    " | 1878. | . | . | . | 93 | 08 |
| "    " | 1879. . | . | . | | 132 | 14 |
| "    " | 1880. | . | . | . | 676 | 08 |

On March 20, 1880, the lease was assigned to the defendant, the assignment containing a stipulation that the assignors should pay all rents and royalties for ore, etc., under the lease, to April 1, 1880, and that those falling due thereafter should be paid by the assignee. During the three succeeding years, the defendant mined and carried away ore to the amount of

Statement of Facts.

1,627 tons and a fraction, and during each of those years he paid to the plaintiff $600 on account of royalty. A large quantity of ore was mined between April 1, 1880, and April 1, 1883, in addition to the 1,627 tons carried away. Of the ore so mined, 3,110 tons were hauled away by the defendant subsequent to April 1, 1883, and an estimated quantity of 1,200 tons still remained on the bank at the mine, at the time of the trial. The defendant made no further payments to the plaintiff, and on March 27, 1884, he notified the plaintiff that the payment of forty cents per ton upon 1,500 tons, would not be made for the year ending April 1, 1884, for the reason that iron ore during said year could not be advantageously mined from the leased premises. In reply, the plaintiff, on April 5, 1884, wrote to the defendant a letter as follows: "Mr. Jos. D. Potts: I send you these few lines to tell you that you have forfeited the iron-ore lease by not paying the royalty on the first day of April, and this shall be your discharge from the mines. And also notify you to come and take your ore, and all belonging to you, off my premises by the first day of September, next. The assignment which you speak of in your letter was not assigned to you by me, and my counsellor tells me as soon as you don't comply with the lease I can go back on Levi B. Smith & Co."

The plaintiff's counsel offered this letter in evidence.

Objected to because it was not in accordance with any provision in the lease.

By the court: Exhibit disallowed; exception.[15]

In January, 1885, in response to another letter from the plaintiff, the defendant wrote declining to make any payment for the year ending April 1, 1885, for the same reason as that assigned in the letter of March 27, 1884. The defendant did no mining after April 1. 1883. Testimony for the plaintiff tended to show that, at the time the defendant stopped mining, ore was in sight in the mine and could easily be taken out. The defendant admitted the indebtedness for the road taxes claimed, and testified in his own behalf that the ore could not be advantageously mined. He was then asked by his counsel to explain the reason of this:

Objected to by the plaintiff, unless the witness confine his answer to physical difficulties or obstacles presenting themselves as a hindrance to advantageous mining.

Statement of Facts.

By the Court: Allowed; exception.[1]

A. There were a number of physical difficulties in the way. The ore, as it now exists in the mine, is quite deep below the surface; in fact, it is much deeper than when I began; then there is an enormous amount of what is technically called "stripping," that is, the removing of earth, which is on top of the ore. The amount of earth to be removed is so very great that, even if the ore were much more valuable than it is, it would not pay to take it out. It would not be worth the price of its cost of mining at the mine, taking the ordinary average price of iron ore as a criterion.

The witness testified further that there was another physical difficulty, namely a trouble connected with the drainage of the mine arising from a quicksand formation at the bottom of it, which caused the pumps used in removing the water to clog, and that the ore yielded a very low percentage of iron and was of a very poor quality. He was then asked:

Q. What will it cost per ton to take this iron ore out and put it on the bank at the Philip Garman mines?

Objected to by counsel for the plaintiff.

By the court: As they are going to explain by this witness whether or not this ore could be advantageously mined, without stating what it costs to mine it, they can ask him now, if they wish, whether it costs more now than it did when he commenced mining. I think this question would be a proper one. Question admitted; exception.[2]

A. Between $2.80 and $2.90 is the cost to take it out and put it on the bank. Q. Does that $2.80 or $2.90 include any royalty? A. No, sir. The royalty is in addition to that and is not included in that estimate. . . . . Q. Have you ever got the ore out and piled on the banks of mine; and, if so, please state what its value per ton is; that is, its money value? A. Not for any price, either for sale or use. It is of no value for sale, as I have been utterly unable to sell it to anyone. If I had not gone to the expense of mining it, I would certainly not give over a dollar a ton for it at the mine. Q. It would not be worth over that? A. Not in my judgment.

By the court: Q. Either for manufacture, or for sale at the bank? A. No, sir; for I can't sell it at any price.

Mr. Pinkerton: Q. Is there a furnace at which you could

Statement of Facts.

manufacture iron at the Philip Garman mines? A. No, sir. Q. How far is your furnace from the mines?

Objected to by Mr. Beyer, counsel for plaintiff. There is nothing in the lease that says where it is, or that the ore mined is to be hauled there.

By the court: Question allowed; exception.[3]

Q. How far is it from the Philip Garman mines to your furnace? A. It is something like eight miles, by ordinary road.

Horace L. Haldeman, called for the defendant, having testified that he had made an analysis of the ore from the Garman mine, was asked:

Q. What do you say as to the quality of the ore?

Mr. Beyer: We object to anything that has to do with the quality of the ore.

By the court: Question admitted; exception.

A. I would not consider it merchantable. Q. Do you call this good merchantable iron? A. I do not.

Question and answer objected to by the plaintiff.

By the court: Allowed; exception.[4]

The testimony of other witnesses for the defendant tended to show that the value of the ore when mined was less than the cost of mining it.

The defendant under objection by the plaintiff and exception, put in evidence a "receipt of Philip Garman dated March 31, 1880, accompanying a settlement with Smiths, who were the lessees." The entire paper containing the receipt referred to in this offer was as follows:

JOANNA, March 31, 1880.

Philip Garman, in account with B. H. Smith and Wm. D. Smith, for settlement of royalty account on the iron-ore lease, given by him to Levi B. Smith & Co., subsequently owned by said B. H. Smith and William D. Smith, and now owned by Jos. D. Potts.

Dr.

| To balance due on royalty account, Apr. 1. 1879, | $3,197 60 |
| To cash advanced, as per receipt below, Mar. 31, 1880, | 600 00 |
| | $3,797 60 |

Cr.

| By royalty on 676 8-20 tons ore, at 40 cts., hauled to date, | $270 56 |
| Leaving balance advanced to date, | $3,527 04 |

Statement of Facts.

$600.00

Received, March 31, 1880, six hundred dollars, as above, on account, the same making, with previous advances, a total of three thousand five hundred and twenty-seven dollars and four cents, advanced on royalty account to date. This sum is to be applied in future settlements of royalty on ore to be mined and carried away hereafter by the said Joseph D. Potts, according to the terms of the aforementioned lease.

PHILIP GARMAN.

Received, Philadelphia, May 1, 1880, of Col. Jos. D. Potts, thirty-five hundred and twenty-seven dollars and four cents, in full of the within advanced royalty; and the right to take away the ore that it represents, is hereby assigned to him.

WILLIAM D. SMITH,
For himself and B. H. Smith.

The defendant also offered, and the court admitted three settlements, between the plaintiff and the defendant, dated respectively April 4, 1881, March 29, 1882, and April 2, 1883.[10] No bill of exceptions to the admission of these papers was printed in the paper-books. They were all in the same form, differing only in the dates and figures. The latest in date was as follows:

BARNESTON P. O., CHESTER CO., PA., April 2, 1883.

Philip Garman, in account with Jos. D. Potts, for settlement of royalty account on the iron ore lease, given by him to Levi B. Smith & Co., subsequently owned by said Jos. D. Potts:

Dr.

| | |
|---|---|
| To balance due on royalty account, March 29, 1882, . | $4,312.82 |
| " cash advanced as per receipt below, April 2, 1883, . | 600.00 |
| | $4,912.82 |

Cr.

| | |
|---|---|
| By royalty on 591 1584–2000 gr. tons ore, at 40 cents, hauled to date, . . . . . . . . . . | 236.72 |
| Leaving balance to date, . . . . . . | $4,676.10 |

$600. Received April 2, 1883, six hundred dollars on above account, the same making (with previous advances) a total of four thousand six hundred and seventy-six dollars and ten cents, advanced on royalty account to date. This sum is to be applied in further settlement of royalty on ore to be mined and carried away hereafter by the said Jos. D. Potts, according to the terms of the aforementioned lease.

PHILIP GARMAN.

In rebuttal, the plaintiff's counsel made the following offer, Philip Garman, recalled:

Charge of Court below.

By Mr. Beyer: We offer to prove by this witness that these papers were explained to him by Mr. Potts, manager, as simple receipts for his $600, and nothing was ever said to him or intimated in any way that the papers changed the lease.

Objected to by the defendant.

By the court: Disallowed; exception.[11]

At the close of the testimony the court, LIVINGSTON, P. J., charged the jury in part as follows:

On the trial of this cause, two points are raised that require the examination of the court and jury. The first of these points is that under the lease which we have just read to you, the defendant is not obliged to mine the iron ore at this mine and pay the royalty to the plaintiff, for the reason that it cannot be advantageously mined. His lease says that he may mine, provided the ore can be advantageously mined. Secondly, even supposing that the ore could be advantageously mined, —we shall come to construe that word "advantageously" after a while,—supposing that it could be advantageously mined at that mine, Mr. Potts has paid, and Mr. Garman has in his hands more money than would pay the royalty on fifteen hundred tons every year during the whole time that he has had the mine, since the lease was transferred by the Smiths to him. . . . .

The particular covenant in this agreement or lease, which causes the contention or difficulty, is in these words: "The parties of the second part also agree to mine the iron ore at the rate of fifteen hundred tons per annum, on an average, provided the iron ore can be advantageously mined, and as much more as they may see fit to mine." The maximum would be fifteen hundred tons, and the royalty would be six hundred dollars; that is, provided the iron ore can be advantageously mined. . . . .

Technical rules are not so much to be consulted in the construction of covenants, as the real meaning of the parties, where this meaning can be gathered from the instrument itself; and the construction which is obviously the most just should always be favored, and the words and the language used are to be taken in that sense in which they were most probably understood by the parties using them; or, in other words, to state it

Charge of Court below.

in a slightly different way, the words and terms used are to be interpreted with reference to the common understanding at the time that the contract was entered into by the parties. Those mining leases, which have given rise to contention and upon which the different decisions of the courts are reported, both in England and America, differ to a large extent from each other, for no two are exactly alike. None are exactly like the one here presented, and, therefore, none of them can be fully relied upon as a precedent in judging another. . . . .

All the cases referred to show that every case must be decided upon its own merits, as presented; and we have seen how leases, covenants, and provisos are to be construed, and what view is to be taken. What is the status of the case as here presented to us?

If the proviso as to advantageous mining were not in this lease, there might be but little difficulty, but the proviso confronts us. How it came to be inserted in this agreement, we need not inquire. The counsel for the plaintiff tell us that Garman and Smith met, and examined the ground and understood what they were about, when they made this lease and inserted this proviso. This may be so, but why did they deem the insertion of such a clause necessary? Was it because it was feared that the iron ore was, or would thereafter prove to be lean, poor, unproductive and unprofitable, yielding a scanty percentage of actual iron to every ton of ore, or that it would become so hard and expensive to mine that it could not be advantageously or profitably mined, it would not make merchantable iron, or that the quantity would decrease so as to be inadequate to pay the costs of mining? We do not know.

We do know that the proviso was put in the agreement, and there it is found. [What does it mean? The word advantageously, lexicographers tell us, means beneficial, profitable, convenient and gainful, when the word is used in cases like the present. Upon looking at the whole matter carefully, we find the proviso should be so construed as to read, provided the iron ore can be beneficially, conveniently, profitably and gainfully mined, making the covenant read as follows: The parties of the second part also agree to mine the iron ore at the rate of fifteen hundred tons per annum, on an average, provided the said ore can be advantageously mined, conveniently, profitably

and gainfully mined, and as much more as they may see fit to mine.]

If the evidence shows that the ore is insufficient in quantity to pay the expenses of mining; or, if it is of such inferior quality as not, when mined, to be of sufficient value to pay the cost of mining or to be used and handled, wrought, worked to advantage in making marketable iron, it could not be said or held that it could be advantageously, beneficially, conveniently, profitably or gainfully mined, plaintiff cannot recover in this action.

Four years prior to the bringing of this action, the plaintiff was notified by Mr. Potts, by a letter which has already been offered in evidence, that payment for the year ending April 1, 1884, would not be made, for the reason that the iron ore could not, during said year, be advantageously mined from the said premises which the agreement covered. He found the proviso in the lease upon which this action is founded, and in his narr or statement of his demand, he alleges that the iron ore can be advantageously mined. This allegation is a necessary one, and he has properly assumed the burden of proving it. To do this he has produced some eight or nine witnesses, with reference to showing the convenience with which this ore could be mined. . . . .

On the other hand . . . . . if the testimony for the defendant is to be believed, it cannot be advantageously mined; if the evidence offered by the defendant be believed, your verdict must be for the defendant.

I say, that if you should not believe the testimony of the defendant, and from the whole evidence arrive at the conclusion that the mining of iron ore at this mine can be advantageously carried on, that is, as I have before stated, beneficially, conveniently, profitably and gainfully mined, your verdict should be for plaintiff, if not paid before settlement. Then the other question arises; it arises indeed whether you do so find or not; does Mr. Potts owe Mr. Garman anything as royalty for the ore mined and taken away, or which, under this lease, should have been mined and taken away?

In the spring of 1880, the lease was transferred to Mr. Potts by the original lessees, who on March 31, 1880, had settled with and paid Garman $600, as shown by their settlement and receipt from him. This left in his hands, of their money,

$3,527.04 to be applied as a credit in any future settlement of royalty of ore to be mined and carried away, at any time thereafter by Joseph D. Potts, according to the terms of the lease. This advance money was transferred on May 1, 1880, by the original lessees who had advanced it, to Mr. Potts.

On April 4, 1881, Mr. Potts and Mr. Garman settled for ore taken and mined, and it appears by the settlement presented and the receipt given by Garman to Potts that there was then a balance of $3,778.77 of Potts's money in Garman's hands, at that date, as an excess of royalty, which, under the agreement, was and should be applied in any future settlements for ore mined and carried away, as a credit. On March 29, 1882, another settlement was had between Mr. Potts and Mr. Garman, for ore mined and taken away, and from that settlement and Mr. Garman's receipt accompanying it, it appears that there was then a balance of Mr. Potts's money advanced to Mr. Garman and in his hands, namely, $4,312.83, which was to be applied in future settlements of royalty on ore to be mined and carried away thereafter by Joseph D. Potts, in accordance with the terms of the lease. On the second of April, 1883, Garman and Potts again settled for ore mined and taken away to that date, and from the receipt of Mr. Garman accompanying the settlement, it appears that there was a balance of the money of Mr. Potts in the hands of Garman, advanced to him, amounting to $4,676.10, to be applied in further settlement of royalty on ore to be mined and carried away thereafter by Mr. Potts, according to the terms of the lease. Since the first of April, 1883, there has been no settlement.

[A period of five years, therefore, had elapsed between the last settlement and the commencement of this suit, and if iron could be advantageously mined, Mr. Potts, under the lease, was bound, on an average, to mine 1500 tons per year, which at a royalty of 40 cents per ton would amount to $600 per annum, and for five years this would be $3,000. This sum, deducted from the money in Garman's hands, would still leave owing by Garman to Potts, $1,676.23, less $9.23 for road tax, to be applied in further settlement of royalty on ore to be mined and carried away after April 1, 1888, by Mr. Potts, according to the terms of the agreement. Or, suppose no ore had been mined by Potts. Mr. Garman by his receipt acknowl-

edges that at the time he settled with the Smiths in the spring
of 1880, he had in his hands $3,527.04, which was to be ap-
plied in future settlement of royalty on ore to be mined and
carried away thereafter by Jos. D. Potts, and it is shown that
in addition to this, Mr. Potts since 1880 has paid Garman
$1,800; this, added to the $3,527.04, would make $5,327.04;
from this deduct royalty on ore to be mined from 1880 to 1888,
eight years, $600 per year, that being the greatest sum that
could be required of Potts in one year, would make $4,800;
this deducted from $5,327.04, would still leave due Potts
$527.04, less $9.23 tax, $517.81; and therefore, your verdict
should be for the defendant. . . . . I would like to have you
state, under the first point, whether or not, from the evidence
offered, the iron ore at this mine could be advantageously
mined. The second, as to whether the money now in the
hands of Garman, and belonging to Potts, shall be applied as
a credit on the amount claimed to be due, is withdrawn.] [12]

The defendant requests the court to charge [inter alia] :

2. Under the terms of the lease given in evidence the de-
fendant was not liable for any rent or royalty, unless the ore
would have been worth when mined at least as much as it cost
to mine it.

Answer : We affirm this point; for the defendant would not
be liable for any royalty under the terms of the lease, unless
the iron ore could be advantageously mined.[8]

The jury returned the following verdict : " We find that un-
der the evidence the iron ore cannot be advantageously mined,
and therefore find for the defendant." A rule for a new trial
having been discharged, judgment was entered on the verdict,
when the plaintiff took this appeal, assigning for error:

1–4. The admission of defendant's offers.[1 to 4]

5, 12. The portions of the charge embraced in [ ] [5 12]

8. The answer to defendant's point.[8]

10. The admission of defendant's offer.[10]

11, 15. The refusal of plaintiff's offers.[11 15]

*Mr. William F. Beyer* and *Mr. William D. Weaver,* for the
appellant :

1. The first nine exceptions relate to the proper construction

of the clause in the lease, " provided the iron ore can be advan-
tageously mined." The defendant contends that this clause
refers, not only to the existence of ore and the difficulties of
mining, but also to the price of labor and the market value of
iron now in the ore, without reference to whether that is more
or less than at the beginning of the tenancy. We contend that
the intention was merely to grant relief against such difficulties
connected with the mine and mining as could not be foreseen,
such as possible quicksands, underground streams, faults in
veins, exhausted ore pockets, etc.; and that, as to everything
that could be seen, tested or analyzed, the rule caveat emptor
applies.

2. The adverb, advantageously, is used in a sentence relating
to mining and the working of the mine alone, and there is
nothing to indicate an intention to deviate from the ordinary
contract by which the lessee takes the chances of the gains
and losses of business, or to make a one-sided lease, giving the
lessee the advantage of a decrease in the price of labor, or a
rise in the price of iron, while enabling him to refuse to pay
rentals, if labor rises or iron falls in price. Jones v. Shears,
7 C. & P. 347 (32 E. C. L. 649), holding that, under a cove-
nant to continue work so long as a mine is " fairly workable,"
the lessee is not obliged to work at a dead loss, was overruled
in Griffiths v. Rigby, 1 H. & N. 239. The lessee is bound to
take into account the possibility of the existence of faults:
Lehigh Coal & N. Co. v. Harlan, 27 Pa. 429; and the exhaus-
tion of the mine is no defence against rent: Bute v. Thomp-
son, 13 M. & W. 486. These were the things this lease was
intended to guard against.

3. Garman received the minimum rental of $600 per annum
and no more; he never was paid any excess to " go as a credit
on iron ore to be mined in future years." Instead of writing
simple receipts, the defendant's managers incorporated in the
receipts taken a statement of the money paid above the royalty
on ore actually carried away, and a claim to haul ore therefor
in the future " according to the terms of the lease." There
are no such terms in the lease, and the insertion of that clause
was either a mistake or a fraud. These receipts, not under
seal, were not admissible to contradict the lease, without proof
of consideration: Whitehill v. Wilson, 3 P. & W. 414; Ken-

nedy v. Ware, 1 Pa. 445; Campbell's Est., 7 Pa. 100; Ackla v. Ackla, 6 Pa. 230; Hartman v. Shaffer, 71 Pa. 316; Kidder v. Kidder, 33 Pa. 269; Bevridge v. Glassey, 112 Pa. 455; Redfield etc. Co. v. Dysart, 62 Pa. 62.

4. In addition to admitting the receipts without proof of consideration, the court erred in not admitting our offer to show a fraudulent explanation of their contents. The idea of over-payment was evidently an afterthought, as is evidenced by the defendant's exacting, when he bought the lease, a stipulation that his assignors should pay the rent due April 1, 1880; by his paying $600 a year for three years, and by his assigning, in the notice to Garman of March 27, 1884, as his sole reason for refusing to pay rent, the alleged fact that the ore could not be advantageously mined. The truth of the allegation of over-payment was therefore for the jury. Under no possible construction, however, have we been paid our road tax, which is due under a separate and distinct covenant, and must in any event be paid in cash. So long as the defendant holds and enjoys the mine, he must pay the rent agreed: Wolf Creek Co. v. Schultz, 71 Pa. 180; Kemble Coal & I. Co. v. Scott, 90 Pa. 332; Powell v. Burroughs, 54 Pa. 335; Clement v. Youngman, 40 Pa. 346. The burden of proof on the question of advantageous working, was on the defendant: Watson v. O'Hern, 6 W. 362.

*Mr. John J. Pinkerton* and *Mr. H. M. North*, for the appellee:

1. That the instruction as to the meaning of the phrase "advantageously mined," as used in this lease, was correct, is abundantly shown by a reference to the authorities, both in England and in Pennsylvania: Jones v. Shears, 7 C. & P. 347 (32 E. C. L. 649); Griffiths v. Rigby, 1 H. & N. 237; Kemble Iron Co. v. Scott, 15 W. N. 220; Muhlenberg v. Henning, 116 Pa. 143. The court submitted the question whether the ore could be advantageously mined to the jury, and the verdict having expressly determined that it could not be, the plaintiff's case is at an end, and it is difficult to see how he can be aided by any review of the charge or by any erroneous admissions of testimony as to the state of accounts between himself and the defendant.

2. The receipt of March 31, 1880, was given by Garman to the

Smiths. Potts was a stranger to it, and cannot be charged with any connection with the drawing of it. Over his own signature Garman acknowledged that $3,527.04 had been overpaid on the royalty, and agreed that the same should be applied to future settlements for ore to be mined and carried away by Potts. On the faith of that, Potts paid the sum named to the Smiths. In subsequent settlements, Garman admitted again and again the correctness of the account, and acquiesced in the terms of the receipts. The receipts subsequently given by Garman to Potts are in the exact words of that given to the Smiths. The court certainly committed no error in adopting the view of the matter taken by the parties themselves.

3. No offer was ever made to prove fraud practiced on Garman by the defendant's managers. Garman can read and write, and signed these receipts with intervals of a year for reflection between them. They in no way changed the lease. The lease says nothing about crediting payments, but simply provides that the rental shall be forty cents per ton on the ore mined and carried away. This is to be paid annually, but only on the ore carried away annually, and no money becomes due until the ore is taken away. Hence any payments in excess of the forty cents upon ore actually hauled, must be offset by ore to be hauled away in the future. Garman's letter, which the court rejected, was merely an expression of his view of the situation and has no bearing on the case. The plaintiff cannot complain upon the subject of the burden of proof. In his pleadings and his testimony, he assumed that burden.

OPINION, MR. CHIEF JUSTICE PAXSON:

The clause in the lease which gives rise to the present contention is as follows: "The parties of the second part agree to mine the iron ore at the rate of fifteen hundred tons per annum, on an average, provided the iron ore can be advantageously mined, and as much more as they see fit to mine."

As the lease was in writing, its proper construction was for the court. The contention arises upon the words "advantageously mined." This language is peculiar, and was evidently intended for the benefit of the lessees. The plaintiff contends that its only effect is to relieve the lessees from hidden defects in the mine, such as a fault, or some physical difficulty in get-

Opinion of the Court.

ting out the ore, not contemplated by the parties, but which is liable to exist in any mine. The court below gave the language in question a broader construction, and held that it meant that the defendant was not liable under the lease unless the ore could be "advantageously, that is, beneficially, conveniently, profitably, and gainfully mined," (see fifth assignment;) and further instructed the jury that, "under the terms of the lease given in evidence, the defendant was not liable for any rent or royalty, unless the ore would have been worth when mined as much as it cost to mine it," (see eighth assignment.)

We are unable to see any error in this instruction. The court below gave to the word "advantageously" its common and popular meaning. It is not a technical word or term of art, and the parties must be presumed to have used it in its known sense. As before observed, it was for the relief of the lessees; hence, if the mining was no longer advantageous to them, they had a right to cease their operations. After defining, as we think properly, the meaning of the word, the court submitted to the jury the question whether the defendant could further work the mine to advantage, and they found specially that he could not. This settles the question of fact adversely to the plaintiff. It is to be observed that the cost of getting the ore to the market was not allowed to enter into the case. It was only the cost of the ore at the mouth of the mine that went to the jury. Surely, if it was not worth as much there as it cost to mine it, the defendant could not mine it advantageously to himself, however beneficial it might be to the plaintiff. We must take this contract as the parties have made it: they might have stipulated for a different rule; it is our duty to construe the lease according to its plain meaning.

There are several other assignments, but the two referred to raise the pivotal question in the case. We find no error in the admission of the testimony referred to in the first four assignments. Under the construction we have placed upon the lease, it was not error to allow the defendant to prove that the ore could not be mined advantageously, why it could not be done, the cost of mining and putting the ore on the bank, and that, when it was so placed, it was not merchantable. Nor was it error to admit in evidence the papers referred to in the tenth

assignment. The object was to prove that, in any view of the case, there was no royalty due under the lease. Upon this ground alone the defendant was entitled to a verdict. The remaining assignments do not require discussion. A careful examination of them discloses no error.

Judgment affirmed.

