## Commonwealth of Pennsylvania v. Elizabeth Hufnal, Appellant.

*Statutes—Canons of construction.*

In construing legislative language it must be received, not necessarily according to its etymological meaning, but according to its popular acceptation, and especially in the sense in which the legislature is accustomed to use the same words.

It is the duty of the courts so to construe statutes as to meet the mischief and to advance the remedy and not to violate fundamental principles, to bring sense out of the words used and not to bring a sense into them, to give words a reasonable construction.

*Criminal law—Sale of separator skimmed milk—Pure Food Act.*

" Plain skimmed milk " is a well known article of food where an approximately certain result as to residuary products of butter fats is attained by an equally well known manual method of skimming; " separator skimmed milk " is a distinctly different result reached by a distinctly different mechanical method whereby the maximum elimination of the butter fats is much greater.

To sell "separator skimmed milk" as skimmed milk is an indictable offense under the Act of June 26, 1895, P. L. 317.

*Evidence—Expert testimony when inadmissible.*

Where the circumstances can be fully and adequately described to the jury, and are such that their bearing on the issue can be estimated by all men without special knowledge or training, opinions of witnesses expert or nonexpert are not admissible.

*Words and phrases—Use of words—Skimmed milk.*

The sense given to particular words by great lexicographers is always entitled to weight, yet where a word is general and common, due regard must be had to the circumstances; the term "skimmed milk" is not a technical one, and must be presumed to have been used in its known and common sense and jurors are as competent as experts to determine its signification.

Argued Dec. 14, 1896. Appeal, No. 143, Nov. T., 1896, by defendant, from judgment of Q. S. Phila. Co., Nov. Sess., 1895, No. 256, on verdict of guilty. Before RICE, P. J., WILLARD, WICKHAM, BEAVER, REEDER, ORLADY and SMITH, JJ. Affirmed. REEDER and WICKHAM, JJ., dissent.

Indictment for sale of milk. Before HARE, P. J.

The indictment contained two counts—one for sale of a certain adulterated article of food, to wit, certain milk from which a certain valuable and necessary constituent and ingredient had been wholly abstracted. The other, for sale of a certain adulterated article of food, to wit, one and more quarts of milk from which a certain valuable and necessary constituent and ingredient had been in part abstracted. The plea was not guilty.

It appeared from the evidence that this was an effort to convict a milk dealer in the city of Philadelphia of a misdemeanor punishable by fine or imprisonment or both, for selling, as skimmed milk, milk from which the cream or butter fat, or the greater proportion thereof, had been removed by means of what is technically known as the separator or centrifugal process in contradistinction to other processes for producing a like result, such as hand skimming, the Cooley process of deep setting, etc. The prosecution was brought under the Act of General Assembly of June 26, 1895, P. L. 317, popularly known as the Pure Food Act.

The defendant had been conducting the milk business at 1333 South Juniper street, Philadelphia, continuously since

1877.   In the month of October, 1895, the chief inspector of milk under the board of health of the city of Philadelphia took, at the bakery of Louis J. Kolb, 1409 South Tenth street, Philadelphia, certain samples of milk out of some nine forty-quart cans said to have been delivered from Mrs. Hufnals, and, upon analysis of these samples, procured her arrest and prosecution. These samples yielded, according to the analysis of the chemist of the board of health, 9.43 per cent total solids, of which .34 of one per cent was butter fat and 9.09 per cent solids not fat. The percentage of ash, constituting a part of the solids not fat, was .71 of one per cent.   This analysis disclosed a percentage of total solids, and of solids not fat, above that required for skimmed milk by Ordinance of City Councils, approved September 23, 1890 (O. 297), and entitled " An ordinance to prohibit the sale of adulterated milk in the city of Philadelphia," which ordinance was printed and circulated amongst the milk trade under the supervision of the board of health.   An offer on behalf of the defendant to prove such ordinance and the fact of such circulation was rejected by the court upon the trial of the cause. The milk was contained in cans conspicuously labeled " skimmed milk," as required by the ordinance.   The commonwealth offered no evidence that the milk in question was different from other skimmed milk, containing a like percentage of total solids, obtained by any process in vogue for effecting a removal of the cream, or butter fat, from the whole milk.   The only proof, apart from the voluntary admissions of the defendant herself, offered to show that the milk was obtained by a process of centrifugal separation, was the analysis above given and the inferences of the witnesses drawn therefrom, and from the general appearance of the milk.   The defendant admitted that the milk had been delivered by her to the bakery ; that it was milk obtained by the centrifugal, or so-called separator, process of removing the cream from the whole milk, and that it was obtained by her from a creamery in Delaware county in the same condition in which it was delivered to her customer.   She also admitted that she delivered to the same bakery large quantities of such milk daily during certain seasons of the year, when the exigencies of the trade made it needful for her so to do, by reason of the general scarcity of milk, and her inability in consequence thereof, to produce at her own establishment from the

whole milk received by her sufficient quantities of skimmed milk to meet the demands of her customers for it.

Louis J. Kolb, the proprietor of the bakery at which the samples of milk were obtained, testified that he received from the defendant some five or six hundred quarts of milk daily for use in his bakery; that the milk received by him was skimmed milk, and that, at certain seasons of the year, this milk was so-called separator-skimmed milk, or milk from which the cream had been removed by the centrifugal process, and that it was delivered to him with his full knowledge of that fact. It was also testified on the trial of the cause that there are in use amongst dairy and creamery people three general processes for the removal of the cream or butter fat, or certain portions thereof, from milk as obtained from the cow (or, as it is designated by the trade and dairy experts, "whole milk"), namely, 1. The old and familiar process of setting the milk away in shallow pans until the cream, or fat globules, rise to the surface, when they are removed by a hand skimmer or ladle; 2. The Cooley and other deep-setting processes, wherein the milk is placed, immediately after being drawn from the cows, in large, deep vessels, so arranged that they can be surrounded with iced water, and thus rapidly cooled, whereby the rising of the cream or fat globules to the surface of the vessels is facilitated and hastened, and the separation rendered more complete. In this process, instead of removing the cream as in ordinary hand skimming by a ladle or skimmer, the milk is usually drawn off by means of a tube and spiggot from the bottom of the vessels leaving the cream as a residuum in the vessels themselves. 3. The separator or centrifugal process, wherein the milk soon after being drawn from the cow, or at any other time before coagulation takes place, is delivered by a tube, as a continuously-flowing stream, into a so-called separator bowl, which is caused to rotate at a high rate of speed, whereby, through centrifugal action, the milk and cream are parted from each other and discharged in small streams from separate outlets provided for them. An offer on behalf of the defendant to demonstrate the character of the last mentioned process, and show the real nature of its action upon the milk, was rejected by the trial judge, and an exception taken and allowed to his ruling therein. It was also testified that the skimmed milk obtained by these several processes of

separation is, in each case, essentially the same product, except as they may vary in the percentage of cream or butter fat remaining in one or the other, and except that the milk obtained by the separator process, under like conditions of cleanliness, is freer than the others from foreign contaminating matter and bacteria of various kinds generally present in milk products. It was also testified that a more or less perfect separation of the milk and cream can be effected by any of the foregoing processes, but that the last mentioned, or centrifugal process, is, under ordinary conditions, the most effective in removing the cream or butter fat where a perfect separation is the object in view; that by the second or deep-setting process, a separation almost as complete can be secured; and that, by careful man ipulation, under favorable conditions, nearly as perfect a separation can sometimes be obtained by the old hand-skimming operation. The general object where any of the processes are used is, to remove from the rest of the milk all the cream which can be obtained within the limits of a wise commercial economy. The centrifugal process, in common with the others, can be so used as to remove any desired proportion of the cream from the whole milk, thus obtaining both cream and skimmed milk of varying degrees of richness, so far as butter fat is concerned, down to the limit of effectiveness, which in every instance in dairy practice falls short of a perfect separation. Verdict of guilty and sentence thereon to pay a fine of $50.00 and costs of prosecution, and stand committed until the judgment be fully complied with.

The court, HARE, P. J., charged the jury as follows : There is no doubt of the principle which the counsel for the defendant has advanced, or, rather, of the fact which he has stated, that in the course of time the meanings of words often undergo a gradual modification, so that a word which at one time designates a particular article or commodity, may at length come to be understood as meaning something quite different. There is, however, at the same time, always a presumption that the meaning has remained unchanged. As we see in the case of our own language words mean pretty much the same thing to-day as they did in the days of Shakespeare and Milton, as for instance, sugar, milk, water, bread and butter, flour, trees and a variety of other things.

[Therefore, speaking from our own knowledge, and we have a right in such matters as the ordinary usage of words, to speak from our own knowledge as well as from any evidence heard before us, we have reason to believe, and perhaps to know, that twenty years ago " to skim " had a definite meaning, and that " skimming " was a process of a particular kind by which matter on the surface of any fluid, which it was desirable to remove, could be taken off by some appropriate implement, such as a large spoon or perhaps a ladle, or some other utensil adapted to the purpose, and that milk when treated in this mannner was said to be " skimmed," and when sold was known as " skimmed milk." We shall not readily believe that the term " skimmed milk " means anything different from what it used to mean, or that milk which has been treated by a different process and is a different article, by reason of the entire absence of a valuable ingredient, can come under the designation of " skimmed milk."] [7]

[It does not follow that because a man is an expert chemist or mathematician that he is an expert in the use of language, and, therefore, when a man was produced here who did not profess to be a philologist, or specially skilled in the study and meaning of words, and, from his knowledge of chemistry, was asked to say what " skimmed milk " is, I considered that he was not an expert to that end and ruled out his testimony. But books may treat scientifically of the meaning of words, and where the men who write them may be supposed to speak after careful investigation and thorough study, such books become authorities upon the subjects treated in them. Therefore, independently of what the jury or the judge would probably and presumably assert without hesitation to be the meaning of " skimmed," or the meaning of " skimmed milk," a dictionary may be resorted to as an authority for the purpose of confirming, or, may be, to some extent, if it should so follow, of shaking the impressions antecedently carried in our own minds. Looking at one of these dictionaries, you will observe that the definition of " skimming " and of what is done " skimmingly," and of what has been done to milk when it has been " skimmed," is throughout the same. That is, that " skimming " is the application superficially of some appropriate means to take off from the surface of a liquid that which it is not thought desir-

able to have remain, or which is to be abstracted in view of its valuable qualities. If this definition be entirely correct, the question, What is skimmed milk? is easily settled. It is milk which has been superficially deprived of its cream by the use of something which answers the purpose of a skimmer. If, however, for this method of superficially removing the cream from the milk you substitute some other process, the question arises whether the milk left as the result of such process should be called "skimmed milk." It may possibly give room for inquiry.

One of the first things for consideration is whether the process is the same, or whether it is actually a new process, acting differently and not upon the surface nor so as to separate what is superficial from what lies below. If different forces are employed, as, for instance, the centrifugal force of rotation, that would be a reason for supposing that the result is not the same; that what is produced by the centrifugal force whirling the milk around and around may not be the same thing as that which results from the application of a ladle or spoon to remove what of its own nature and by the operation of natural forces has arisen to the top of the liquid and is then in a condition to be removed. But, if in addition to this difference of process, when we come to examine the thing produced, we find that the result is not the same, that there is a material point of difference, not only in the means employed, but in the product itself, then I think we shall have reason to suppose that such product is not that which is generally known as "skimmed milk," but that it should have some other designation, if an accurate meaning is to be conveyed to the minds of the hearers, and in the case of a sale, if the purchasers and consumers are to understand what is offered to them by the dealers.] [8]

[Whether the introduction of a new process varies the result so that milk from which the cream had been extracted by the new method could or could not be properly called skimmed milk does not arise here. You are all familiar with the method in which milk is set for cream and allowed to cool, and the separation which takes place by levity of the cream from the milk and how it is then removed by a spoon or ladle. If you were to substitute for that method a process like the Cooley process, where the milk is cooled and the cream allowed to rise of its own motion to the top, as in the old method, with

the simple difference that instead of raising the cream off the surface of the milk, you allow the milk to flow out below through a narrowing channel, so that you really get the superficial part, what is on top, separted from the rest, which flows out below, and I were asked whether the milk so obtained would be "skimmed milk," within the proper meaning of the term, so that it could be properly sold as such by a vendor, I could not answer that question until it had been ascertained whether the product was substantially the same as if the cream had been removed by skimming, and if such proved to be the fact, that is to say, if the ratio or proportion of cream remaining in the milk after the Cooley process was the same, or nearly the same, as that remaining after the milk had been skimmed in the old method, then I would incline to the conclusion that it might be called skimmed milk, because the scum on top had been removed, although in a different way. But that is not the case here. The question is not with regard to milk obtained by the Cooley process. It is in regard to milk obtained by a process radically different; not a process which allows the cream to rise by its own levity to the top, there to be superficially removed; or a process by which all that is merely milk is drawn off from below, leaving a scum on top, so that there is effected a separation of the scum, or what rises, from that which remains below, although in a somewhat different way; but it is a process in which the whole body of the milk is subjected to a centrifugal force which operates on every particle of the liquid, which propels each particle to the side, and, as it is said, drives off all the lighter particles, including the cream, or so nearly all, that what remains is not worth considering. This process, I should say, the means being different and the result different, is not skimming. Milk so treated is not skimmed milk, and, therefore, cannot properly take its place in the ranks of skimmed milk for the purposes of sale.] [9]

It is, no doubt, true that various products may be obtained from the same substance by the abstraction of one or more of its valuable ingredients, and yet that no law has been made, and that no law ought to be made, to interfere with their sale. It is not worth while to consider whether the manufacturer of chocolate falls within that rule, or whether it would apply to the different grades of flour. You could not have a better

instance of the application of the principle that it is not necessarily wrong to abstract a valuable ingredient from any substance, and to sell the residue, than in the case of milk itself which may be legally sold, although a part or the whole of the cream has been removed by skimming, or in any other way. If the liquid which remains after the entire or partial abstraction of the cream be subjected to the action of rennet, there is another separation into curds and whey. In all these cases valuable elements have been abstracted, and yet the product may be sold under its appropriate name, which can mislead no one. The whole milk, milk which has been skimmed and thus lost so much of its cream as floats upon the surface, milk which has been whirled in a separator and lost all its cream, and finally milk which has been separated into curds and whey may each be sold under its proper designation. I would not say that the legislature could not prohibit such sale, but it certainly could not do so wisely.

What the legislature has endeavored to secure in this enactment is that each of them shall be sold under its proper name; that each shall be sold so as to indicate fairly to the buyer that he is getting something different from that which the article was before the separation was effected.

When milk is sold as milk, simply and purely, everyone knows what he has a right to expect, and if that which is sold is not whole milk, a wrong is done to the purchaser, and the case is within the statute if it is adulterated either by the addition of water or by the abstraction of solid matter. Skimmed milk has lost a portion of a valuable ingredient, but the name carries notice of that fact with it. Everybody of common sense who buys skimmed milk knows he is buying milk which has lost some valuable portion of its original ingredients. There is no deception, because he knows he is to pay less and get a different thing, a thing in general less nutritious, but which in some particular cases may be better. So a man who buys separator milk, which has been properly labeled, might not know the exact fact that from that milk all the cream had been withdrawn, but he would know that there had been a separation, and if he did not choose to inquire more closely it would be his own fault, and finally in a very little while this particular product, being sold as separator milk, would become known as

such, and would be bought and sold for just what it is, with reference to the amount paid and the particular article received.

I need hardly go further, for I have sufficiently pointed out the idea. If a man sells the curds which he has taken out of the milk and then sells the whey which is left, everybody knows that whey means something from which the curds has been withdrawn. No man could be held liable under the statute because he was selling whey which he had obtained by withdrawing from the milk, by a process of cheesemaking, something which was very valuable.

What the legislature intended was this : That any particular product which differs from that which has hitherto been known under a certain name in being less valuable by reason of the abstraction of some ingredient, shall not be sold under that name. It must be given some name which will carry warning with it, which will prevent the public from being imposed upon.

[It seems that, within a few years, that which could not be thoroughly effected before, has been accomplished by a new process of separation, and while, taking the average, milk that was skimmed contained two fifths as much cream as it did before skimming, it is possible by this process to take all the cream out, leaving the cheesy matter practically untouched. The product of this process should, therefore, be sold for what it is, a new product, so that everybody may know it.] [10] The statute does not forbid the process by which it is produced, by which it came into vogue, any more than it prohibits the sale of cheese because cheese has lost a portion of the matter which was originally in the milk and is now whey.

[It seems to me, therefore, if you come to the conclusion that skimmed milk means milk which has been skimmed, in the ordinary acceptation of the term, by the removal superficially of the scum or cream that has risen to the surface, and that it has certain valuable ingredients always present to an appreciable or to a large extent ; and that the removal of the cream by the separator process, while it affects the taste and appearance of the milk to some degree, yet does not so materially do so as to put everyone on his guard, but does really diminish the nutritive properties of the article produced by the abstraction of all the cream instead of leaving two fifths thereof in the milk, your verdict should be for the commonwealth, if the article was sold

generally as skimmed milk, because the new product does not answer to the old name, because it has been obtained by the entire abstraction of a valuable ingredient, and because, although it may be useful for some purposes it is not as useful for other purposes, and, finally, because it is the right of the buyer or consumer, when he goes to buy, to get what he wants. If he wants something which is not forbidden by law and which suits his palate, though it may not be quite as good as something else, he is entitled to get it. But he is not to be palmed off with a different thing, because there is evidence that for some purposes that different thing is as good as anything else. In point of fact, in this case, we have positive proof that for general purposes milk which loses part of its cream is rendered thereby less valuable. A valuable ingredient is partially gone, and the legislature forbids its sale for the thing that it was before such valuable ingredient was removed.

If it then be subjected to another process and what is left of the valuable ingredient be also taken out, and it is then sold for what it was before, this is also a breach of the legislative enactment, and if the jury find that this has occurred in the present case, their verdict should be for the commonwealth.] [11]

I do not understand the defense to deny the proposition that, if a man should skim milk carefully and exactly, and remove all the cream that he could get by that process and leave what would undoubtedly be skimmed milk, containing, we will say, two fifths of all the cream originally in the milk, and then should hand it over to the separator process and, by subjecting it to a very different force, take all the rest of the cream out, he would thereby have made a change in the conditions of the substance which would not leave him entitled to sell it for what it was before the second change was made. I suppose that would be conceded by the defense, but, whether it is or not, I think if a man, after skimming the milk and removing all the cream he could get off in that way, should say, " There is something left here which I might turn to account and yet sell this milk for as much as I did before ; now, I will put it into this separator and get all the cream out and still call it skimmed milk, and put it on the market with the chance of getting the same price ; I won't call it separator milk, because that will put people on their guard." I think, I say, that would be a case really against the

statute, and it cannot be right, because the result is the same price for a different article.

Again, if the effect of the separator process had been to take out all the cheese as well as all the cream, or a part of the cheese and a part of the cream, I do not understand the defense to deny that it would be a violation of the statute to sell such product as skimmed milk, or to claim that in such case the defense could rely on the fact that the value had not been changed, and say : " There is too much cheese in milk, the stomach won't bear it." The question would be : " Have you taken out some portion of the cheese which was originally there, and do you call it the same thing after the cheese is gone ? "

[If taking part of the cheese from the milk and selling it still as skimmed milk, or by any other name you pleased, that did not indicate the result, would be a breach of the statute, why is the removal of the remaining part of the cream not a violation of the statute also ?] [12]

[I do not know in this instance that it is expressly contended that this defendant did not sell contrary to the statute. It is said the person to whom she sold knew all about it. But the act does not say after you have effected a change you may sell it to people who know all about it. It says it shall not be done, and for a very good reason, because you ought to sell it by some name that would signify what it really is. If a man who is indicted for such an offense could escape by pleading that the buyer knew what he was getting, by saying " Why, the man who bought it knew perfectly well what it was," or " I told him what it was," it would be very difficult to convict, and hence the legislature has distinctly said : " The thing should not be done." " An article from which a valuable ingredient has been abstracted shall not be sold by the same name as the old product, whether the buyer is or is not deceived."] [13]

[The counsel for the defendant urges that you should not convict her because such a verdict would stain her reputation as a milk dealer. In a case like the present growing out of the violation of a statute, which has not received a judicial con- struction or passed into the common knowledge of mankind, the worst that will probably follow from a conviction is the mini- mum fine of $50.00. On the other hand, if you acquit the defendant, it will go forth to the world that part of the valuable

ingredients of an article of commerce may be abstracted and the residue sold as if there were no change, other people would be led to disregard the act, and, on the whole, it may finally end in more convictions than if the law is strictly applied in the first instance, by saying that the defendant is guilty, and will have to pay the penalty to the extent of some $50.00 or $60.00] [14]

If you come to the conclusion that skimmed milk means milk that has been "skimmed," in the ordinary acceptation of the term, by the removal superficially of so much of the cream as has risen to the surface and find that it has a valuable ingredient always present to an appreciable extent, and that abstraction of the cream by a separator materially affects the taste and appearance of the milk, rendering it less nutritive, your verdict should be for the commonwealth.

[Mr. Fisher: I ask your honor to charge the jury to the effect that the third clause of the third section of the act of June 26, 1895, does not apply to separator skimmed milk when sold as skimmed milk.

The Court: To milk separated by this process?

Mr. Fisher: That it does not apply to milk from which the whole or any percentage of the butter fat has been abstracted by any process which does not result in the deterioration of the quality of the skimmed milk otherwise than by the abstraction of the fat, when such milk from which the butter fat has been abstracted, is sold as skimmed milk.

The Court: Otherwise than as the result of that abstraction?

Mr. Fisher: Yes, sir; otherwise than as the result of that abstraction.

The court declined to charge as requested by Mr. Fisher.] [15]


*Errors assigned* were (1) in excluding the following question, propounded to Louis J. Kolb, immediately after he had testified that, by the use of skimmed milk in his bakery, he obtained better results, meaning thereby better bread, than when he used whole milk:

" Q. When you use separator-skimmed milk in your bakery do you get as good results as when you use the hand-skimmed milk?"

(2) In excluding the following questions propounded to Edward B. Voorhees after he had testified to the fact that he

was director and chemist of the agricultural experiment station for the state of New Jersey, and had been qualified as an expert in dairy practice, and as a food analyst:

" Q. What is the comparative value of fat and of caseine and of sugar in the milk product ? "

" Q. Is separator-skimmed milk a wholesome article of food ? "

The purpose of which questions, as stated by counsel, was, " to show by the witness that separator-skimmed milk is an entirely wholesome and valuable article of food, containing with the exception of the butter fat, the whole or nearly all of the valuable and nutritive properties of the milk, in a condition freer from all contaminating foreign matter, and from bacteria causing fermentation, than any other kind of 'skimmed milk.'

(3) In excluding the following question propounded to Carlos B. Cochran, produced on behalf of the defendant as an expert in food analysis and in all matters pertaining to dairy practice and milk products.

The Court: We will take it for granted that this witness is an expert.

Mr. Fisher (counsel for defendant) : I offer to prove by this witness what is understood by dairy experts by the term " skimmed milk."

The Court : Is not that a matter in each individual's bosom? How can he speak for anybody else ?

Mr. Fisher : I offer to prove what the usage is amongst dairy experts, so far as the use of the term " skimmed milk" is concerned.

The Court: You offer to prove what the term " skimmed milk " signifies, as generally used ?

Mr. Fisher : As generally used.

The Court: You want to prove what the term " skimmed milk " signifies as in general use in the community ?

Mr. Fisher: Yes, sir; I will put it in that form.

The Court: Am I right in supposing you have shown the witness to be an expert as regards chemistry ?

Mr. Fisher : I want to prove that this witness is an expert in chemistry as a food analyst, that he is a dairy expert, that he is one of the chemists to the dairy and food commissioners of this state, and that he is an expert in all matters connected with the practice of dairies and the analysis of milk and relating to all products of milk.

The Court: He being an expert in those things, you want to call him to prove what is the signification of the term "skimmed milk" among the community at large? I rule that offer out on this ground, that the witness is not shown to be an expert in the use of words in any sense that he is entitled to instruct the jury in this case. It ought not only to appear that he knows something, but that he knows something which is beyond the reach of most people.

Mr. Fisher: I withdraw my last offer and ask your honor to rule upon the first offer.

Offer read as follows: "I offer to prove by this witness what is understood by dairy experts by the term 'skimmed milk.'"

The Court: Do you mean by people engaged in the manufacture of milk in the dairy?

Mr. Fisher: By people engaged in the dairy industry and by those who are experts in it.

The Court: How it is used by the people who are engaged in the manufacture or preparation of milk in dairies?

Mr. Fisher: Yes, sir; and by analysts and those who make it their business to have a knowledge of dairy products.

Offer objected to. Objection sustained. Exception for defendant.

(4) In excluding the following offer of testimony to be given by George Maloney, called and qualified on behalf of the defendant as an expert witness—

Mr. Fisher: I propose to show by this witness, and by the production of diagrams and an actual separator bowl what the process of centrifugal separation is, and and the principle upon which it is operated, and the results which are obtained by that process as compared with other processess of separating the cream or butter fat from the other portions of the milk.

Objected to.

The Court: The last part is the question at issue here, but I did not know that there could be any dispute whether this process separated, as it professes to do, the butter from the milk. Inasmuch as that had to be proved by the commonwealth in order to make out a case, I suppose it may be disproved by you, that is, supposing that any such testimony can be produced. I suppose you mean what milk treated in that way becomes. You want to show the effect of this process?

Mr. Boyle: I am willing to go to the jury this minute and rest my case on the testimony of the three expert witnesses who have testified for the defense, Mr. Voorhees, Mr. Dudley and Mr. Cochran.

The Court: I think you ought to lay the ground by showing he is an expert in the use of the machine, and knows of his own knowledge what effect it produces.

By Mr. Fisher:

" Q. Are you personally familiar with this process of extracting, by the use of the centrifugal separator, the cream from the milk? A. In the manufacture of dairy implements we construct, set up and operate all kinds of machines for the extraction of cream from the milk. Q. You are practically familiar with the operation of those machines? A. I consider I know as much about that as anybody of my age. I do not pretend to be a medical expert, or anything of that kind; but when it comes to the operation of centrifugal machine skimming of milk, I think I have made as careful a study of it as anyone."

Offer read.

By the Court: " Q. Tell me whether you have ever worked in a dairy? A. Yes, sir. That comes in our business. Q. You have worked yourself in the separation — A. Yes, sir. In the separation and manufacture of butter, and the whole process. Q. And you know what the result is? A. Yes, sir."

The Court: I reject the offer as a whole.

Exception for defendant.

(5) In excluding the following offer of testimony, to be given by Dr. Henry Leffman, produced on behalf of the defendant as an expert in chemistry and food analysis.

Mr. Fisher: I propose to show by Dr. Leffman the processes of manufacturing various food products which are analogous to skimmed milk, and which are obtained by the abstraction of valuable and necessary ingredients from the original products of nature, and to show that these products vary in quality in the same manner and in like degree with the variations which are found in skimmed milk.

Objected to. Objection sustained. Exception for the defendant.

(6) In excluding the following offer of testimony, to be given by George T. Gravenstein, produced and qualified as a witness on behalf of the defendant—

Mr. Fisher: I want to prove by this witness, in the first instance, that this circular (marked " A " and hereto attached) has been distributed amongst the milk trade by the milk inspectors, or board of health, as the case may be.

" EXHIBIT A, SIGNED C. A. GUILBERT.

" An Ordinance to prohibit the sale of adulterated or impure milk in the City of Philadelphia.

" Section 1. The Select and Common Councils of the City of Philadelphia, do ordain, That whoever by himself, or by his servant or agent, or as the servant or agent of any person, sells, exchanges, or delivers, or has in his custody or possession, with intent to sell or exchange, or exposes or offers for sale as pure milk, any milk from which the cream or any part thereof has been removed, or which has been watered, adulterated, or changed in any respect by the addition of water or other substance, shall be liable to the penalties hereinafter provided in this ordinance.

" Sec. 2. No dealer in milk, and no servant or agent of such a dealer shall sell, exchange, or deliver, or have in his custody or possession with intent to sell, exchange, or deliver, milk from which the cream or any part thereof has been removed, unless, in a conspicuous place above the centre, upon the outside of every vessel, can, or package from, or in which such milk is sold, the words ' Skimmed Milk ' are distinctly marked in uncondensed Gothic letters not less than one inch in length. Whoever violates this provision of this section shall be liable to the penalties hereinafter provided in this ordinance.

" Sec. 3. No person shall sell, exchange, or deliver, or have in his custody or possession with intent to sell, exchange, or deliver, skimmed milk containing less than eight and fifty hundreds (8.50) per cent of the milk solids exclusive of butter fat. Whoever violates the provisions of this section shall be liable to the penalties hereinafter provided in this ordinance.

" Sec. 4. That every person who shall sell or who shall offer for sale, or who shall transport or carry for the purposes of sale, or who shall have in possession with intent to sell or offer for sale, any impure, adulterated or unwholesome milk, and every person who shall adulterate milk, or who shall keep cows for the production of milk in a crowded or unhealthy condition, or

feed the same on food that produces impure, diseased, or unwholesome milk, or shall feed cows on distillery waste, usually called 'swill' or upon any substance in the state of putrefaction or rottenness, or upon any substance of an unwholesome nature, shall be liable to the penalties provided in this ordinance.

"Sec. 5. That the addition of water or any other substance or thing is hereby declared an adulteration, and milk that is obtained from animals that are fed on distillery waste, usually called 'swill,' or upon any substance in a state of putrefaction or rottenness, or upon any substance of an unwholesome nature, or milk that has been exposed to or contaminated by the emanations, discharges, or exhalations from persons sick with any contagious disease by which the health or life of any person may be endangered, or milk from tubercular cows, is hereby declared to be impure and unwholesome.

"Sec. 6. That in all prosecutions under this ordinance, if the milk shall be shown, upon analysis by the chemist to the board of health, or by any chemist or chemists appointed or designated by the director of the department of public safety, to contain more than eighty-eight per cent of watery fluids, or to contain less than twelve per cent of milk solids, or to contain less than eight and fifty-hundredths (8.50) per cent of milk solids exclusive of butter fat, such milk shall be deemed, for the purposes of this ordinance, to be adulterated.

"Sec. 7. That any person who shall violate any of the provisions of this ordinance shall be liable to a penalty of $50.00 for the first offense, and $100 for a second offense or subsequent offense, to be sued for in the corporate name of the city of Philadelphia, and recovered in the same manner, and by the same proceedings and process as the law provides for the recovery of debts of the like amount, and all such penalties.

"Sec. 8. That the director of the department of public safety shall appoint an inspector of milk, together with such assistants, analysts, clerks, and collectors of samples as may be considered necessary to enforce the provisions of this ordinance by the board of health through the director of the department of public safety, at such compensation as may be approved by the city councils; said inspector or assistants having reason to believe the provisions of this ordinance are being violated, shall have power to open any can, vessel, or package containing milk,

whether sealed, locked, or otherwise, or whether in transit or otherwise; and if, upon inspection, he shall find such can, vessel, or package to contain any milk which has been adulterated, or from which the cream or any part thereof has been removed, or which is sold, offered, or exposed for sale, or held in possession with intent to sell or offer for sale, in violation of any section of this ordinance, said inspector is empowered and directed to take a sample of the same for analysis and put into a can, vessel, or package, to be sealed in the presence of one or more witnesses, and sent to the chemist of the board of health, or any chemist or chemists appointed or designated by the director of the department of public safety ; and also to condemn the same and pour the contents of such can, vessel, or package upon the ground, or return the same to the consignor, and if, upon analysis, such milk shall prove to be adulterated, shall direct said suit to be brought against the person or party so violating the law : Provided, however, that if, upon analysis, it is proved that the condemned milk is unadulterated, the city shall be liable for the value of the article destroyed : ' Provided, also, that in each and every case where an inspector shall deem it necessary to condemn the milk belonging to any dealer, servant or agent, he shall, at the time of taking and sealing his sample, in the same manner and form seal a sample of an equal quantity of the milk condemned, and deliver it to the dealer, servant or agent with a written notice certifying that he has condemned so many gallons of milk, and taken samples of the same for examination and proof, one of which samples he has returned sealed to the dealer, servant or agent with this notice of condemnation.'

"Sec. 9. That it shall be the duty of the inspector to keep a complete record of his proceedings as inspector, giving a full account of all inspections of milk made by himself or his deputies or others for the said board of health, including the names of each person, producer, firm or corporation owning or claiming to own the milk so inspected, together with their farms, places of business or residence, or the railroad station used for shipment or delivery thereof, and the results of the analysis in each case, which record shall be the property of the board of health under the director of the department of public safety. And the board of health shall furnish for publication monthly in the city newspapers willing to publish the same, a full list

or bulletin of all producers and dealers from whose milk samples shall have been taken during the previous calendar month, with the results of the analysis in each case attached, with such notes as shall indicate, so far as possible, to what extent the samples may appear to be adulterated or otherwise altered to be deficient within the meaning of this ordinance.

"Sec. 10. No person shall be liable to the penalties under this ordinance if he shows to the satisfaction of the magistrate or court before whom he is charged with any violation thereof, that he could not have ascertained that the milk was altered, adulterated, impure or unwholesome.

"Approved the twenty-third day of September, A. D. 1890.

"EDWIN H. FITLER,

"Mayor of Philadelphia."

(7–15) portions of the judge's charge reciting same.

*Wm. Righter Fisher*, for appellant.—The questions involved in these several assignments of error are almost wholly, but not entirely, questions of interpretation, affecting the meaning and purpose of the Act of June 26, 1895, P. L. p. 317. The errors in this respect (that is, the errors of interpretation,) complained of may be most appropriately divided into two classes, although they are closely intertwined with each other and in great part infringe against the same principles of law.

1. Those which have led to the conclusion on the part of the court, and to the instruction to the jury, that the sale of skimmed milk obtained by the separator, or centrifugal process, when sold as "skimmed milk," is a sale forbidden by the act in question.

2. Those which have led to the conclusion on the part of the court, and to the instruction to the jury, that the defendant should be convicted under the act, although every imputation of a "guilty mind" on her part had been completely negatived, and there remained no semblance of an intent by her to defraud or deceive, or purvey to her customers an article either injurious or unwholesome in itself, or misrepresented as to its true nature and quality. (See particularly the 13th and 14th specifications of error.)

It is a cardinal and elementary principle of interpretation that penal statutes are to be construed strictly: U. S. v. Wiltberger, 5 Wheat. 76; Bucher v. Com., 103 Pa. 528; Warner

v. Com., 1 Pa. 154; United States v. Kirby, 7 Wall. 482; Stewart v. Com., 10 Watts, 306.

It is equally a principle of law, applicable to the interpretation of statutes, alike consonant with common sense and common justice and founded upon necessity and reason, that, in determining what is the general object of the legislature, or the meaning of its language in any particular passage, that intention and that meaning which appears to be most agreeable to convenience, justice and reason, should in all cases open to doubt be presumed to be the true one. See Endlich on the Interpretation of Statutes, sec. 245: Bishop on Statutory Crimes, (2d ed.,) sec. 82; 1 Kent's Commentaries, 462.

The cases in which the courts have made a practical application of these principles, in their various phases, to the interpretation of statutes are almost without number: Texas & Pacific Ry. Co. v. Interstate Commerce Comm., 152 U. S. 197; United States v. Fisher, 2 Cranch, 358; Phila. v. Ridge Ave. Railway Co., 102 Pa. 190; Oates v. Bank, 100 U. S. 239. See, also, as cases more or less fully illustrating these principles: Reiche v. Smythe, 13 Wall. 162; United States v. Union Pacific R. R. Co., 91 U. S. 72; Aldridge v. Williams, 3 How. 9; Murray v. Gibson, 15 How. 421; Hines v. R. R. Co., 95 N. C. 434; Vane v. Vane L. R., 8 Ch. 383; Clohessy v. Roedelheim, 99 Pa. 56.

There is another principle of law, not specifically or exclusively a principle of statutory interpretation, but, nevertheless, one of importance in its bearing upon the meaning of the act here under consideration. It is thus briefly stated by Mr. Bishop, in his New Criminal Law, sec. 287: "There can be no crime large or small, without an evil mind." See also sec. 303 A, n. 6.

Does the act forbid the sale, under the generic name of "skimmed milk," of milk which has been skimmed, or had a part or the whole of the cream or butter fat removed from it by the centrifugal or separator process, or by the Cooley process, or by any other process than that of hand skimming, so long as such removal of the cream does not result in a deterioration of the milk otherwise than by leaving it without the cream? To state the question seems like answering it.

Supposing for the moment that the learned judge of the court below was right in his conclusion that separator-skimmed milk

is not "skimmed milk" within the meaning of the act, or even within the usages of trade, does it follow that the defendant here has been justly convicted? Can it be true that, under this act, one who sells an article of food, neither injurious nor unwholesome in itself, nor misrepresented by word or act in respect to either its quality, composition or derivation, nor sold in direct violation of the plain, unmistakable, unequivocal mandate of the statute itself, can be convicted and criminally punished for a breach of the law?

Indeed, when we came to view the statute in its entirety from end to end, to compare and construe all its parts together, as the common law and common sense says should be done, and then apply the just and salutary principles which have been cited in this brief, there is apparently but one rational interpretation which can be put upon it, and that interpretation makes it clear, consistent with itself and with the principles of right and justice, with the wholesome principles of criminal jurisprudence, with the honest liberty of the citizens of a free and intelligent community, and even with those decisions of our courts which hold that a man may be convicted and punished for unwittingly doing what a statute peremptorily and unqualifiedly forbids. The evident purpose of the enactment of this statute, as gathered from its language upon a proper comparison and construction of all its parts, is to prevent and punish the fraudulent and corrupt foisting upon the public of food products, which have been adulterated by additions or abstractions whereby their quality and value have been deceptively reduced or injuriously changed, or which have been fraudulently manipulated so as to conceal some damaging or deleterious defect; and likewise to prevent and punish the purviewing to the public, as sound and good, food products, which have undergone decomposition, become tainted or rotten, or been derived from an infected source whereby they become the vehicle of disease and injury to the public health. The very gist and kernel of the act, so far as regards its purpose, is the prevention and punishment of a public injury having its basis, its roots, in deception and falsehood, in a wilful disregard of honest dealing, or in a wilful disregard of the public health; and to constitute an offense under it, there must be either an intent to deceive, to foist upon the public something under the cover of a falsehood, or an in

tent to purvey to the public that which is unwholesome and injurious in its nature, or else such negligence or lack of care in ascertaining the quality of the article so purveyed, as is held by the law to be tantamount to an evil mind.

But a conclusive demonstration of the intent and scope of the act is to be found in the history of its origin and the uniform construction that has been placed upon the definitions incorporated in it both by the scientific expert from whose brain it was evolved and by the legislatures and courts of the several states in which it was originally enacted and from whose statute books it has been copied, in an emasculated form, by our own legislature. This history of the act shows that it had no reference whatever to the infinite variations in quality to be found in all manufactured and natural products, but was alone directed to the end of preventing sophistication and fraud and protecting the commercial and consuming public against the sale of actually deleterious drugs and foods.

The act had its origin in an essay upon food and drug adulteration by Geo. W. Wigner, a distinguished analyst of England, written in response to an invitation by the national board of trade of this country for the submission of competitive essays on that subject, in which should be incorporated the draft of an act " designed to prevent injurious adulteration, and to regulate the sale of food without imposing unnecessary burdens upon commerce." The prize offered by the board of trade for the best of these essays was duly awarded to Mr. Wigner on October 27, 1880, and the essay itself with the report of the committee will be found in " The Analyst" of January, 1881, pp. 3–9.

That Mr. Wigner had no thought of his definitions ever being so construed as to be applied to the prohibition of unsophisticated articles of commerce is conclusively shown by the fact that he recommends the adoption by the legislature directly or through a properly constituted board, of certain limits of excellence for articles named by him. In this connection are found, inter alia, the following suggested limits:

" Milk shall contain not less than 9 per cent by weight of milk solids, not fat, and not less than 2.50 per cent of butter fat."

" Skim milk shall contain not less than 9 per cent by weight of milk solids, not fat."

" Butter shall contain not less than 80 per cent of butter fat."

" Cocoa shall contain at least 20 per cent of cocoa fat."

" Vinegar shall contain not less than 3 per cent of acetic acid."

Almost immediately following the approval and publication of this essay, on March 25, 1881, the act as recommended was adopted, almost totidem verbis, by the legislature of New Jersey and even a superficial examination of this and the accompanying legislation must demonstrate that the purpose of the enactment was conceived as being that here contended for, and unquestionably that conceived by Mr. Wigner himself.    See General Statutes of New Jersey, published under the authority of the legislature, March 20, 1895, p. 1175 et seq., under heading " Food and Drugs."

A like act incorporating the recommendations and definitions of Mr. Wigner's essay was enacted in the state of New York also in 1881.    See the Revised Statutes, Codes and General Laws of the state of New York, etc., by Clarence F. Birdseye, 1890, p. 32 et seq.

Also see p. 35 of same edition of the New York Statutes, a sample resolution of the board of health of the state of New York, adopted under the provisions of the above act, fixing the limit of strength or acidity for vinegar, as proceeding directly in conformity with the recommendation of Mr. Wigner and with the universally accepted purpose of the act itself and the definitions contained in it.

The same act without material modifications was adopted in the state of Ohio, March 20, 1884.    See Revised Statutes of the state of Ohio, edited by Florien Gianque, 7th ed., p. 2223 et seq.

All the foregoing acts cover drug as well as food adulteration according to Mr. Wigner's original draft and are more careful specimens of legislation than the Pennsylvania act of 1895 ; but so far as it goes the Pennsylvania act differs in no substantial respect from those of which it is a copy, and incorporates, without material change, the definitions of Mr. Wigner's essay in so far as they relate to food adulteration.

Aside from the particular interests involved in the present case any interpretation by the Pennsylvania courts of these carefully wrought out and highly approved definitions out of harmony with their original and generally accepted purpose and meaning would be nothing short of a public misfortune.    The interpretation given to them by the learned judge of the court below is clearly such a perversion of their original intent.

It appears to be clear error that his honor, in the portions of his charge assigned for error, practically, indeed for every useful purpose, wholly withdrew from the jury the determination of the question whether centrifugally-separated milk was "skimmed milk" or something other than "skimmed milk." This was certainly a question of fact to be found by the jury, and, upon the view of the statute taken by the court at the trial, a vital fact in the prosecution of the cause.

*Samuel A. Boyle,* assistant district attorney, with him *George S. Graham,* district attorney, for appellee.

OPINION BY ORLADY, J., April 12, 1897:

The defendant, a dealer in milk in the city of Philadelphia, was convicted under an indictment in which she was charged with unlawfully selling "a certain adulterated article of food, to wit, certain milk from which a certain valuable and necessary constituent and ingredient had been wholly abstracted, contrary to the act of the general assembly in such case made and provided, and against the peace and dignity of the commonwealth;" and in a second count for so selling "a certain adulterated article of food, to wit, one or more quarts of milk from which a certain valuable and necessary constituent and ingredient had been in part abstracted." The indictment was under Act of June 26, 1895, P. L. 317, to which the defendant pleaded not guilty.

This act of assembly to provide against the adulteration of food, and providing for the enforcement thereof, defines by section 2, "The term ' food ' as herein used, shall include all articles used for food or drink by man, whether simple, mixed, or compound," and by section 3, "An article shall be deemed to be adulterated within the meaning of the act: (*a*) In the case of food, (1) If any substance or substances have been mixed with it so as to lower or depreciate or injuriously affect its quality, strength or purity. (2) If any inferior or cheaper substance or substances have been substituted wholly or in part for it. (3) If any valuable or necessary constituent or ingredient has been wholly or in part abstracted from it. (4) If it is an imitation of, or if sold under the name of another article. (5) If it consists wholly or in part of a diseased, decomposed, putrid, infested, tainted or rotten animal or vegetable substance

whether manufactured or not,—or in case of milk if it is the produce of a diseased animal. (6) If it is colored, polished, or powdered, whereby damage or inferiority is concealed, or if by any means it is made to appear better or of greater value than it really is. (7) If it contains any added substance or ingredients which is poisonous or injurious to health; provided that the provisions of this act shall not apply to mixtures or compounds recognized as ordinary articles or ingredients of articles of food, if each and every package sold or offered for sale be distinctly labeled as mixtures or compounds, and are not injurious to health."

The defendant was convicted and brings this appeal.

The health of the people of the commonwealth must stand at the very head of legislative considerations, and the interpretation of this statute must be made by the same rules which have always determined questions affecting the life, liberty, and happiness of our people. All new laws, though penned with the greatest of technical skill and passed upon the fullest and most mature deliberation, are considered as more or less obscure and equivocal until their meaning is fixed and ascertained by a series of particular discussions and adjudications: Dwarris on Statutes, 49.

It is legislative language we are to construe, and it must be received, not necessarily according to its etymological meaning, but according to its popular acceptation, and especially in the sense in which the legislature is accustomed to use the same words: Phila. & Erie R. R. Co. v. Catawissa R. R. Co. 53 Pa. 20.

The sense given to particular words by our great lexicographers is always entitled to weight, yet where a word is used in an act of assembly, regard must be had to the circumstances surrounding its use: Penna. R. R. Co. v. Price, 96 Pa. 256. The term "skimmed milk" is not a technical word, or term of art, and the parties must be presumed to have used it in its known sense: Garman v. Potts, 135 Pa. 506. The testimony of experts would not aid the jury in determining the meaning or signification of a well known and frequently used word in the community by explaining how that particular term was used, or what it was understood to mean in the dairy trade or by the public at large. The jurors were as competent as the expert.

Where the circumstances can be fully and adequately described to the jury, and are such that their bearing on the issue can be estimated by all men, without special knowledge or training, opinions of witnesses, expert or nonexpert are not admissible: Graham v. Penn. Co., 139 Pa. 149; Com. v. Gibbons, 3 Pa. Superior Ct. 408.

It is the duty of the courts so to construe statutes as to meet the mischief and to advance the remedy, and not to violate fundamental principles ; to bring sense out of the words used and not to bring a sense into them, to give the words a reasonable construction: Dwarris on Statutes, p. 144.

The commonwealth proved, that the article seized by the milk inspector of the board of health of Philadelphia was what is known as separator skimmed milk in a forty-quart can— marked with the name " E. & B. Darlington, Chadds Ford " and " skimmed milk," and the manner of producing the different grades of skimmed milk was as follows : plain skim milk is secured by allowing whole milk to stand until the cream rises to the surface and then by means of a dipper or similar implement the cream is skimmed from the surface and the residue is skimmed milk.

By the Cooley process, milk is immersed in cool water, and after the cream has risen, the milk is drawn from beneath the cream, and that which is drawn off from beneath the cream is called Cooley skimmed milk, and has less of the butter fat than hand skimmed milk.

By the separator process, the milk is passed through a centrifugal separator under rapid motion by which the cream and fats are forced to the sides of the apparatus and the product left is separator skimmed milk,—with nearly all the butter fats abstracted.

As shown by the evidence in this case, milk is not regarded as a definite chemical compound, nor even as a mixture of bodies in fixed and invariable proportions. The cows of different breeds and even the milk of the same animal may be subject to wide differences. The age, food, health, habits and treatment of the animal always affect the quantity and quality of the milk. And while the ordinary method of separating the cream, either for direct use or for butter making, is by allowing it to form on the surface and skimming it off with a spoon, ladle, or

similar implement, ingenious adaptations of machines have been introduced to more rapidly and effectively part the butter fats from the other constituents.

The residuary product has its distinctive name, separator skimmed milk, to indicate just what has been accomplished— that a valuable and necessary constituent has been wholly or in part abstracted from it, not only from the original milk, but as well, from the milk known to the trade as skimmed milk.

It cannot be urged that she was careful, honest, or innocent in selling under the label, in large letters, "Skimmed Milk," that which she knew was not so recognized in the trade, or by the board of health of the city.

She must have known that it tended to cheat the public by the false name which she gave to it, and admitted it was not as nutritious or valuable as a health food.

The name on the milk cans, taken with her knowledge of the contents, was a concealment and misrepresentation of its quality and food merit; one of the things which the legislature intended to prevent in this Pure Food Law.

The fact that scientific experts may pronounce a manufactured article, intended for human food, to be wholesome and not injurious, and that in a pure state it may be thus good for food, does not render it incompetent for the legislature to prohibit the manufacture and sale of the article, if in the judgment of the legislature, and not of the courts, it is necessary to the protection of the lives, health and property of the citizens, and to the preservation of good order and the public morals: Commonwealth v. Powell, 114 Pa. 265; affirmed in Powell v. Commonwealth, 127 U. S. 678; Commonwealth v. Shirley, 152 Pa. 170.

By the means used in this case a fraud is practised on the public, in delivering to the purchaser, a cheaper as well as an entirely different article, and on the honest dealer who must be driven from the market by such deceit.

Skimmed milk, as such, is a legitimate article of trade and is sold in large quantities for uses to which the purchaser can properly apply it.

Usage and custom have not only given this product a name, but qualities and attributes which are associated with the name. As such, it is purchased and used for special purposes. The

demand for the different grades of milk has been met by new devices which furnish new results, and each should be given a distinctive name to truthfully represent the strength, purity, and health merit of the product. The sale of these is not prohibited by the act of 1895, if they are honestly made as articles, or ingredients of articles, of food; and each and every package, sold or offered for sale, be distinctly labeled as mixtures or compounds; and are not injurious to health.

This difference was certainly known to the defendant, as her testimony not only discloses full knowledge of the different grades, but as well, that the product which she sold as indicated by the marked can, "Skimmed Milk," was not that which she recognized as "Skimmed Milk" but an entirely different article called "Separator Skimmed Milk;" the market value of the latter being one half the former, with nearly all the butter fats extracted by mechanical means. When selling to retail customers she would put in the "Separator Skim Milk" some hand-skimmed milk to render it more like the hand-skimmed article.

She also testified that she did not buy skimmed milk but separator milk. And on cross-examination:

Q. "Are you able to tell his honor and the jury whether or not any valuable ingredient or constituent had been taken from the separator milk before you sold it?" A. "That I could not say, I sold it just as I received it." Q. "You know the fat is taken out of it do you not?" A. "Yes, sir." Q. "Do you regard the fat as a valuable ingredient in milk as a food?" A. "I suppose it is." Q. "And the fat is taken out of the separator milk you sell?" A. "A portion of it." Q. "Is it not almost all; substantially all?" A. "That is the cream, you mean?" Q. "Yes, I mean the butter fat." A. "Yes, sir." Q. "Substantially all of it is taken out?" A. "Yes, sir. I suppose." In this, the defendant plainly admits the sale to have been made in direct violation of the prohibition contained in the statutory definition of adulteration "6th . . . . or if by any means it is made to appear better or of greater value than it really is."

Again, the ordinance to prohibit the sale of adulterated or impure milk in the city of Philadelphia, offered in evidence in her defense, and the Act of Assembly, July 7, 1885, P. L. 260, to which frequent reference was made during the trial, puts the question of her knowledge past all doubt.

The learned judge under this evidence was right, referring to the separator skimmed milk,—in saying to the jury, "Milk so treated is not skimmed milk, and therefore, cannot, properly take its place in the ranks of skimmed milk for the purpose of sale."

The sale of nine forty-quart cans of separated milk was admitted. The sole question was, whether there had been any valuable or necessary ingredient or constituent wholly or in part abstracted from it. And under the defendant's evidence there was no dispute as to this. The argument of counsel to show that separator skimmed milk, Cooley skimmed milk, and plain skimmed milk are one and the same article is not convincing in view of the defendant's admission, and the testimony of her witnesses.

The merit of this admittedly inferior article of milk for general purposes as a health food, as compared with other grades, is largely a matter of opinion based on training and experience, but the legislature evidently intended that sales of all articles of food or drink for use by man should be so marked and sold as to not leave in doubt, questions affecting their strength, quality or purity; and to prohibit sales being made under a label which deceitfully misleads, and by which the article sold, "6th is made to appear better or of greater value than it really is."

There was no error in saying: "It seems to me, therefore, if you come to the conclusion that skimmed milk means milk which has been skimmed in the ordinary acceptation of the term, by the removal superficially of the scum or cream that has risen to the surface, and that it has certain valuable ingredients always present to an appreciable or to a large extent; and that the removal of the cream by the separator process, while it affects the taste and appearance of the milk to some degree, yet does not so materially do so as to put every one on his guard, but does really diminish the nutritive properties of the article produced by the abstraction of all the cream instead of leaving two fifths thereof in the milk, your verdict should be for the commonwealth. If the article was sold generally as skimmed milk because the new product does not answer to the old name, because it has been obtained by the entire abstraction of a valuable ingredient, and because, although it may be useful for some purposes it is not so useful for other purposes, and finally, because

it is the right of the buyer or consumer, when he goes to buy, to get what he wants. If he wants something which is not forbidden by law, and which suits his palate, though it may not be quite as good as something else, he is entitled to get it, but he is not to be palmed off with a different thing because there is evidence that for some purposes that different thing is as good as anything else. In point of fact, in this case, we have positive proof that for general purposes milk which loses part of its cream is rendered thereby less valuable. A valuable ingredient is partially gone and the legislature forbids its sale for the thing that it was before such valuable ingredient was removed. If it then be subjected to another process, and what is left of the valuable ingredient be also taken out, and it is then sold for what it was before, this is also a breach of the legislative enactment, and if the jury find that this has occurred in the present case their verdict should be for the commonwealth."

The commonwealth, it is true, relied on the sale made to the baker, but the defendant deemed it necessary to answer, and admitted having made sales to the public almost continuously since 1888.

The defense is not required to take up any burden until the prosecution has made out a case sufficient to support a verdict. Burden of proof is a very different thing from presumption of innocence. The first is a formal rule confined to determining the order in which the proofs are to be brought forward; a rule that ceases to apply as soon as sufficient proof has been introduced to sustain a verdict. The second is a substantial rule, operating during the whole trial, and continuing to operate until the case is finally determined : Wharton's Crim. Evid., sec. 330.

Her admission of facts, under cross-examination on the trial, though not meant to be inculpatory, are as sufficient to sustain the verdict, as if the same facts had been adduced by the commonwealth in chief.

The case was carefully tried, and the verdict was fully warranted by the evidence.

The assignments of error are overruled and the judgment is affirmed. The record to be remitted to the court below to the end that its sentence may be executed.

DISSENTING OPINION BY REEDER, J., April 12, 1897 :

I cannot unite with the majority of the court in their interpretation of the law as applied to the facts in this case.

First.—I believe that the proper definition of skimmed milk is milk from which the cream has been wholly or partially removed no matter by what process. The only method known for removing cream from milk was by skimming it from the top with a spoon or some similar utensil until recent years, when other methods were invented. The purpose of both the old and the new methods was to remove as much cream as possible from the milk. The method used by the old process gave the residuum the name of skimmed milk—the new process only differing in its effect upon the milk by the removal of more cream; the residuum by the latter process only differing from that in the former in this, that the cream is more successfully removed. In my opinion it is still proper to designate and sell this as "skimmed milk." Indeed many if not most of the lexicographers define "skimmed milk" as "milk from which the cream has been removed."

Second.—The sales made to the baker Kolb, the only ones proved by the commonweath when their case closed was made with his full knowledge that the milk that he was buying was milk from which the cream had been removed by the centifrugal process. In fact he said the defendant herself told him so when he bought the milk. The act does not prohibit the sale of "separator milk" when sold as such so long as it retains all the constituents it had when it came from the separator.

Third.—Any failure of the testimony to justify the conviction of the defendant by sales to Kolb, the testimony of the commonwealth relating only to sales to him, could not be supplied by her admission in cross-examination that she had made sales to other persons, as the commonwealth's case related to, and they relied for conviction only upon, the sales made to Kolb.

For these reasons I cannot concur in the opinion of the majority of the court and file this dissent.

WICKHAM, J. I concur in the above dissenting opinion, for the first and second reasons given in support of the same.